UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHERITA SKIPPER,

        Plaintiff,

   v.

UNITED STATES OF AMERICA,

        Defendant.
                                      /

CASE NO. 14-cv-14281
HONORABLE GEORGE CARAM STEEH

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT (DOC. #18) AND DISMISSING CASE**

Plaintiff Cherita Skipper ("plaintiff") brings this action against the defendant United States of America ("defendant") under the Federal Tort Claims Act, 28 U.S.C. §1346, *et seq.* Plaintiff alleges that she sustained injuries in a motor vehicle accident with a United States Postal Service ("USPS") vehicle in Detroit, Michigan, affecting her ability to lead a normal life. Specifically, plaintiff claims injuries to her right shoulder, right knee, neck, and lower back. As a result, plaintiff seeks to recover third-party non-economic benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.* Now before the court is defendant's motion for summary judgment arguing that plaintiff has not established a compensable injury under the No-Fault Act. (Doc. #18). The court dispensed with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f)(2). For the reasons that follow, defendant's motion for summary judgment will be granted.

-1-

## I. BACKGROUND

The facts that follow and the inferences that can be drawn from those facts are taken in a light most favorable to the plaintiff, as the court must do in ruling on a motion for summary judgment.

### A.     The Accident

On January 3, 2014, around 6:00 p.m. to 7:00 p.m., plaintiff was driving a 2002 Dodge Neon in Detroit, Michigan. Plaintiff's son, Denzel, was a backseat passenger in the vehicle, and his girlfriend, Laquita, was in the front passenger seat. As the Dodge Neon was completely stopped on Fenkell street waiting to turn left onto Pierson street, it was hit from behind by a USPS vehicle driven by Denise Burgen, a USPS letter carrier. Both vehicles suffered minimal damages. Plaintiff's vehicle did not require any repairs.

Plaintiff testified at her deposition that the impact of the crash caused her right knee to hit the dashboard and that she hit her head on the steering wheel. Plaintiff stated, "Out of nowhere I remember a hard hit and when I opened my eyes I just remember — I hit my head. I remember my right leg going up into the dashboard and I remember going forward and hit my head." (Pl's. Dep. Tr. 10:17–23). Plaintiff noticed that she had blurry vision for approximately two-to-three minutes after the impact. She believes that she lost consciousness for a short period of time. When plaintiff regained consciousness, she pulled her vehicle over to the side of the road to avoid incoming traffic.

Eventually, police officers and an ambulance arrived at the scene. Plaintiff told an emergency medical technician ("EMT") that her neck, head and knee were all hurting. The EMT helped plaintiff out of the car, placed a neck brace on her, and transported her to the ambulance on a stretcher.

Plaintiff was taken by ambulance to DMC Sinai-Grace Hospital. At the hospital, plaintiff underwent a CAT scan and multiple x-rays were taken. Plaintiff testified that she was told at the hospital that she suffered from a concussion. She was discharged from the hospital after a couple of hours and she went home.

### B. Pre-Accident Medical History

Plaintiff is 40 years old. Plaintiff's well-documented medical history traces back to at least 2000. (Doc. #18-7 at 3).

In 2003, when plaintiff was 28 years old, she was treated at Sinai-Grace Hospital for lower back pain after having surgery — umbilical herniorrhaphy[1] — two weeks prior. (*Id.* at 4). Plaintiff was given Valium, morphine and Naprosyn, and she was discharged home from the hospital. (*Id.* at 5).

In 2004, plaintiff reported to the emergency at Sinai-Grace Hospital with complaints of a right breast mass and a migraine headache. (*Id.* at 6). It was noted that plaintiff had been recently hospitalized for anemia and received blood transfusions, and, at that time, her migraine headaches were much worse in intensity. (*Id.*). The final diagnosis was acute migraine cephalgia and right breast mass, etiology unknown. (*Id.*).

In 2006, plaintiff had an acromioplasty procedure completed at Henry Ford Hospital for her right shoulder.[2] (Doc. #18-8 at 4). She subsequently reported to physical therapy

---

[1] Umbilical herniorrhaphy treats an umbilical hernia, which "occurs when part of the intestine protrudes through the umbilical opening in the abdominal muscles." *See* Mayo Clinic, Umbilical hernia definition, available at http://www.mayoclinic.org/diseases-conditions/umbilical-hernia/basics/definition/con-200 25630.

[2] "Arthroscopic acromioplasty is used to treat severe cases of impingement syndrome, a condition resulting from an injury to the rotator cuff muscles and often seen

at Henry Ford with "complaints of right shoulder pain ranging from 5 to 10 on a scale of 0 to 10. . . ." (*Id.*). It was noted that plaintiff demonstrated "decreased passive range of motion at 90 degrees of flexion, 7 degrees of abduction, and 0 degrees of external rotation." (*Id.*). It was also noted that plaintiff required assistance with bathing and dressing, and that she was unable to perform household chores for two to three weeks. (*Id.* at 4–5). The clinical impression was that plaintiff would benefit from "a program consisting of upper extremity stretching and strengthening. . . ." (*Id.* at 4).

Also in 2006, plaintiff reported to Henry Ford Medical Center Emergency Department with right lower back pain that had been persistent for the prior three days, stating that she had a pain level of 9 out of 10. (*Id.* at 6). She visited the same hospital again in 2009 reporting lower stomach pain for the prior 2 weeks. (*Id.* at 8). Upon departure from the hospital, plaintiff reported a pain level of 6 out of 10. (*Id.* at 9).

Plaintiff's current primary care physician, Nicholas A. Marsheh, M.D., began treating plaintiff sometime in 2006. (Marsheh Dep. Tr. 6:12–18). Dr. Marsheh testified that plaintiff has the following medical conditions that were present prior to the motor vehicle accident involved in this case: high cholesterol, chronic stable asthma, systemic lupus, chronic back pain with occasional flare-ups, chronic abdominal pain, low potassium which can affect the heart, osteopenia (a stage before osteoporosis), generalized arthritis in her entire body significant enough to require treatment with medication, and diabetes. (*Id.* at 8:1–18:9).

---

in aging adults. In the impingement syndrome, the tendons of the rotator cuff muscles become irritated and inflamed as they pass through the subacromial space, the passage beneath the acromion." *See* Arthroscopic Acromioplasty, Singapore Sports and Orthopaedics Clinic, *available at* www.orthopaedics.com.sg/treatments/arthroscopic-acromioplasty. This results in "pain, weakness and loss of movement at the shoulder." *Id.*

Dr. Marsheh testified that plaintiff's most significant medical condition is her abdominal pain, related to her systemic lupus. (*Id.* 10:6–13). Dr. Marsheh stated that the pain started around 2008 or 2009. (*Id.* 11:2–4). Asked about the general effect that plaintiff's abdominal pain has on her, Dr. Marsheh testified:

> I think it made her lose even her job, affected her daily life. Took a big toll on her life with the multiple surgeries that she acquired. And I remember at one time she had to leave her job as – I think somewhere in the dietary department in Crittenton [Hospital].

(*Id.* 10:20–24). In addition, Dr. Marsheh testified that the lupus "is known to cause the arthritis, and severe pain," and plaintiff was "already requiring aggressive treatment for that, including daily steroids and pain management." (*Id.* 15:11–14).

Since 2006, plaintiff has been taking multiple medications, including muscle relaxers, pain medication, and anti-inflammatory medication. (*Id.* 15:15–16:5). Because her pain level has been moderate to severe for a long time, which Dr. Marsheh considers to be "a lot of pain," plaintiff's medications are numerous. (*Id.* 16:11–16). Dr. Marsheh testified that plaintiff's condition, based on her multiple problems, was "progressively getting worse" between 2012 and 2015, and that she was being prescribed more pain medication that treated her universal pain. (*Id.* 17:3–13; 20:19–20). Indeed, "the pain and the disease was affecting her joints, affecting her strength making her neurologically weak[,]" and "her medical condition [was] deteriorating." (*Id.* 20:9–13; 24:1–5).

Medical records in late 2011 show that plaintiff complained of "back pain with pain radiating down her right leg all the way to the calf." (Doc. #18-11 at 19). Her diagnosis was "[a]cute back pain, acute sciatica, [and] acute atypical chest pain." (*Id.* at 20). Due to her

lupus and asthma, in early 2012, Dr. Marsheh restricted plaintiff from bending, lifting, pushing and pulling, and standing for long periods of time. (Doc. #18-12 at 4).

Plaintiff continued seeking medical treatment prior to the accident involved in this case. On April 15, 2013, plaintiff was reporting knee and back pain, pain in the joints, and muscle weakness. (*Id.* at 19:3–16). On May 13, 2013, plaintiff visited Dr. Marsheh's partner, Dr. Asmar, complaining of joint pain, swelling and stiffness, and pain radiating to her shoulder, elbow, forearm, writs, hand, buttock, hip, thigh, and knee. (*Id.* 20:23–21:8). Indeed, by May of 2013, plaintiff regularly needed a walker to get around. (*Id.* 20:16–17; 22:4–12). On October 14, 2013, plaintiff visited Dr. Asmar complaining of chronic abdominal pain. (*Id.* 22:24–23:14).

Because of her debilitating condition, plaintiff filed for Social Security disability benefits in June 2013. In her application for benefits, plaintiff stated that she became unable to work because of her illnesses, injuries and conditions that have caused her pain since March 14, 2009, and that her symptoms first interfered with her ability to work as early as 2001. (Doc. #18-22 at 2). In her claim for benefits, plaintiff represented that she had not returned to work since April 9, 2012, "due to the intensity of her medical problems[.]" (*Id.* at 14). In addition, it was noted that plaintiff was issued a cane and walker on November 15, 2011, and that she continued to use the cane. (*Id.* at 16).

Full Social Security disability benefits were granted to plaintiff on June 19, 2013. (*Id.* at 21). In the administrative law judge's ("ALJ") findings of fact and conclusions of law awarding plaintiff's benefits, the ALJ stated:

> The claimant has the following severe impairments: systemic lupus erythematosus (SLE) with myalgias and arthralgias affecting multiple joints and muscles with joint stiffness with clinical need for walking aid (wheeled

walker) to reduce pain (13F); chronic bronchial asthma; sensory polyneuropathy affecting right sural and superficial peroneal nerves and left sural neuropathy (20F); disc bulge at L4-5 and L5-S1 and facet arthropathy (9F); left hip tendonosis (19F); and a depressive disorder (14F). . . .

(*Id.* at 24). The ALJ credited plaintiff's testimony that she had "the following symptoms: bilateral leg pain, left hip pain, low back pain to the left hip, frequent bilateral hand cramping, back spasms, constant abdominal pain, asthma, lupus flare-ups, depression, and fatigue." (*Id.* at 25). The ALJ also credited plaintiff's testimony that "she could lift very little; sit/stand/walk very little; perform little to no postural activities; and that she needed to be carried up and down the stairs and that she spends most days at her aunt's house so she is with someone all the time." (*Id.*). Plaintiff continues to receive Social Security benefits for disability unrelated to the accident.

### C. Post-Accident Medical History

After the accident, plaintiff was referred by Dr. Marsheh to Raj Bothra, M.D. at the Pain Center in Warren, Michigan. (Doc. #20 at 34). On January 14, 2014, plaintiff complained to Dr. Bothra of "neck pain going to both shoulders, arms and hands, mid back pain, lower back pain going to both hips and both legs, [and] knee pain." (*Id.*).

Shortly after, on January 21, 2014, plaintiff was treated by Dr. Asmar. (Marsheh Dep. Tr. 13:8–15; 25:14–19). Plaintiff complained about chronic back pain and being involved in a car accident. (*Id.* 13:10–12; 25:20–25). Imaging studies were completed, and plaintiff also underwent an MRI at an outside facility. (*Id.* 13:18). The results showed "degenerative changes" of the back and an impingement involving the right hip. (*Id.* 13:18–23). Plaintiff did not suffer any fractures. (*Id.* 13:21–23).

Throughout 2014 and 2015, plaintiff received injections to treat her shoulder and knee pain. She also underwent physical therapy and chiropractic care with David Sandler, D.C. Sandler conducted spinal manipulations, cervical traction and mechanical massages.

In March 2015, plaintiff underwent an independent medical evaluation ("IME") with Stefan Glowacki M.D., an orthopedic doctor. (Doc. #20 at 130). Based on a review of multiple medical records and a physical examination, Dr. Glowacki opined that plaintiff had (1) a partial tear of a medial collateral ligament, (2) a partial tear of her right shoulder ligament, and (3) contusion of the cervical spine and lumbosacral spine. (*Id.* at 133). Dr. Glowacki concluded:

> Unfortunately after the injury she still has pain. She has had treatments, physical therapy, and Chiropractic treatments but her condition did not improve and she cannot do much by herself. She needs domestic help and attendant care 10 hours a day 7 days a week. Unfortunately she is not able to do anything by herself. In the near future she will need surgical intervention of the right knee.

(*Id.* at 133).

In April 2015, plaintiff underwent an IME with Steven Arbit, MD, from Specialists in Rehabilitation Medicine, P.C. (Doc. #18-20 at 4). In addition to conducting a physical examination of plaintiff, Dr. Arbit reviewed plaintiff's medical records. (*Id.*). Dr. Arbit concluded:

> After completing a comprehensive history and physical examination it is my opinion there are issues with symptom magnification. Her right knee examination is inconsistent and really with most issues one would expect that with the way she moves it or limits it there would be a fracture, though there is no effusion and besides complaints of pain and complaints of limited range of motion her knee examination is good. She has complaints of tenderness to the upper trapezius. She has inconsistencies on exam and poor effort with a ratchety giveaway weakness pattern for strength pattern.

\* \* \* \*

> . . . I am not seeing any abnormality, which would be consistent with traumatically induced issues. I do not see a need for further medical care, household replacement services, or attendant care.

(*Id.* at 8).

Moreover, Dr. Marsheh testified that plaintiff's current medical condition continues to deteriorate, but he does not believe that it is related to the accident involved in this case. (*Id.* 24:24–25:2). Rather, Dr. Marsheh believes plaintiff's current medical condition is related to her lupus and her chronic pain, which includes pain in her abdominal area and her back. (*Id.* 25:3–7). Indeed, Dr. Marsheh testified that plaintiff is "not somebody totally healthy getting into a car accident, and then you can tell where the stages are. Here we already have a patient on heavy pain medication, going to physical therapy, even pain management referral at one point." (*Id.* 29:6–12).

### D. Dr. Femminineo's Expert Opinion

The government retained Joseph P. Femminineo, M.D. to provide an expert opinion as to the extent of plaintiff's alleged injuries. Dr. Femminineo authored a report on September 24, 2015, after reviewing a significant number of plaintiff's medical records. (Doc. #18-19). Dr. Femminineo opined that there was nothing in the imaging studies "that would translate into any long term sequelae as it relates to the accident in question." (*Id.* at 3). In addition, Dr. Femminineo opined that plaintiff did not require any additional household chore assistance after the accident different from household chore assistance she was already receiving prior to the accident. (*Id.* at 4). Dr. Femminineo concluded that plaintiff's physical limitations predated the accident in this case, and that there were no long term injuries sustained as a result of the accident. (*Id.*).

### E. Plaintiff's Testimony

Plaintiff testified that her knee pain is more severe after the accident, that she has to use a cane to walk at some point each day, and that her shoulder pain had resolved in 2007 and returned only after the accident. In addition, plaintiff testified that, although she used to take medication every other day, she now takes medication every day since the accident. After the accident, plaintiff testified that she cannot brush her hair, lift groceries or shop for herself, put on or take off shirts, and that she has trouble sleeping.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distrib. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson*, 477 U.S. at 247-48 (emphasis in original); *see also Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial."  *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 252.  Rather, there must be evidence from which a jury could reasonably find for the non-movant.  *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

### III. DISCUSSION

Under the FTCA, liability "is usually determined by referencing state law." *Premo v. United States*, 599 F.3d 540, 545 (6th Cir. 2010) (citation omitted). Here, both parties agree that the applicable law is Michigan's No-Fault Act. Plaintiff's claim is a third-party action under the No-Fault Act, i.e. a traditional negligence claim. A third-party action may seek economic damages, non-economic damages, or both.

**A.     Economic Damages**

Generally, a first-party action, i.e. an action brought by an accident victim against his or her own insurance company, permits the recovery of personal injury protection ("PIP") benefits. These benefits are awarded without regard to fault. Mich. Comp. Laws § 500.3105(2). First-party benefits include allowable medical expenses such as costs associated with recovery and rehabilitation, loss of income during the first 3 years after the date of the accident, and replacement services. Mich. Comp. Laws § 500.3107.

A third-party action also permits the recovery of some economic damages. Third-party actions may seek PIP benefits above and beyond the benefits that are permitted in first-party actions. These include "[d]amages for allowable expenses, work loss, and survivor's loss . . . in excess of the daily, monthly, and 3-year limitations contained in those sections." Mich. Comp. Laws § 500.3135(3)(c).

Defendant argues that plaintiff has not incurred (nor does she appear to be seeking) any economic damages defined in § 500.3135(3)(c). Plaintiff does not challenge defendant's position. Indeed, plaintiff's opposition brief focuses on her attempt to establish a genuine issue of material fact as to whether her ability to lead a normal life has been affected. As will be explained, this standard is applicable in determining whether *non-*

*economic* damages are recoverable. Because plaintiff has not offered any proof that she is entitled to economic damages for a third-party claim pursuant to § 500.3135(3)(c), nor does she appear to be seeking such benefits, defendant is entitled to summary judgment as it relates to any purported claim for economic damages.

### B. Non-Economic Damages

Non-economic damages are also recoverable in a third-party action if a person injured by a motor vehicle has "suffered death, serious impairment of body function, or permanent serious disfigurement." Mich. Comp. Laws § 500.3135(1). A "serious impairment of body function" means "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." Mich. Comp. Laws § 500.3135(7); *McCormick v. Carrier*, 795 N.W.2d 517 (Mich. 2010). The Michigan Supreme Court has explained the court's role in determining whether a question of fact exists as to the serious impairment threshold:

> The court should determine whether there is a factual dispute regarding the nature and extent of the person's injuries, and, if so, whether the dispute is material to determining whether the serious impairment of body function threshold is met. If there is no factual dispute, or no material factual dispute, then whether the threshold is met is a question of law for the court.

*McCormick*, 795 N.W.2d at 537.

Defendant argues that plaintiff has not established a serious impairment because (1) she did not suffer a serious injury in the accident, and (2) her ability to lead a normal life has not been affected by the accident. The court agrees that plaintiff has not established a genuine issue of material fact surrounding the effect on her ability to lead a normal life after the accident. Because summary judgment is appropriate on this basis alone, it is not

necessary to discuss whether plaintiff has established that she suffered a serious injury in the accident.

Assuming without deciding that plaintiff had established a serious injury that was caused by the accident, she has not met her burden in showing that her inability to lead a normal life resulted from the accident. As the Michigan Supreme Court explained in *McCormick*, for a person's ability to lead a normal life to be affected, the injury must "have an influence on some of the person's capacity to live in his or her normal manner of living." 795 N.W.2d at 530. Thus, "[d]etermining the effect or influence that the impairment has had on a plaintiff's ability to lead a normal life necessarily requires a comparison of the plaintiff's life before and after the incident." *Id.*

> Here, plaintiff argues:
>
> Before the accident, although she had lupus, she had full use of her right shoulder, pain free. She could walk without a cane 3 days a week. Ms. Skipper was able to brush her hair without assistance and had a social life which was far more active than it was after the accident. As a result of the impairments she has required the assistance of others to accomplish household and personal care tasks....
>
>  In addition, because of the impairments, she has required extensive medical and physical therapy care.

(Pl's. Resp. Br. at 16).

Plaintiff's argument that her ability to lead a normal life was affected by the accident is contradicted by the overwhelming evidence in the record. The medical evidence described above details plaintiff's injuries and limitations long before the accident. By 2013, when plaintiff applied for Social Security benefits, she represented that "she could lift very little; sit/stand/walk very little; perform little to no postural activities; and that she needed to be carried up and down the stairs and that she spends most days at her aunt's house

so she is with someone all the time." (Doc. #18-22 at 25). Dr. Marsheh testified that plaintiff's systemic lupus, dating back to 2008 or 2009, affected her ability to lead a normal life. Specifically, Dr. Marsheh testified that "it made her lose even her job, affected her daily life. Took a big toll on her life with the multiple surgeries that she acquired." (Marsheh Dep. Tr. 10:20–24). Dr. Marsheh further explained that plaintiff's condition is degenerative in nature, that it "is known to cause . . . arthritis, and severe pain," and plaintiff was "already requiring aggressive treatment for that, including daily steroids and pain management." (*Id.* 15:11–14). As late as May 13, 2013, plaintiff visited Dr. Marsheh's partner, Dr. Asmar, complaining of joint pain, swelling and stiffness, and pain radiating to her shoulder, elbow, forearm, writs, hand, buttock, hip, thigh, and knee. (*Id.* 20:23–21:8). Dr. Marsheh explained that plaintiff's impairments were progressively getting worse between 2012 and 2015 requiring more pain medication. (*Id.* 17:3–13; 20:19–20). Her lupus was "affecting her joints, affecting her strength making her neurologically weak[,]" and "her medical condition [was] deteriorating." (*Id.* 20:9–13; 24:1–5).

Plaintiff's reliance on Dr. Glowacki's IME report is misplaced. Nothing in Dr. Glowacki's report establishes that plaintiff's ability to lead a normal life was affected by the accident. Indeed, as explained above, plaintiff's limitations existed prior to the accident. Dr. Glowacki's report does not establish that anything was different after the accident.

In sum, plaintiff has not met her burden in establishing a triable question of fact regarding the accident's alleged effect on her ability to lead a normal life. Accordingly, defendant is entitled to summary judgment.

## IV. CONCLUSION

For the reasons explained above, defendant's motion for summary judgment is GRANTED. This case is DISMISSED.

IT IS SO ORDERED.

Dated: March 3, 2016

            s/George Caram Steeh
            GEORGE CARAM STEEH
            UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on March 3, 2016, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---